Case No. 21-2134

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SHEET METAL WORKERS' HEALTH &
WELFARE FUND OF NORTH CAROLINA, et al.,

*Plaintiffs/Appellees,*

v.

STROMBERG METAL WORKS, INC.,

*Defendant/Appellant.*

**OPENING BRIEF OF APPELLANT
STROMBERG METAL WORKS, INC.**

Douglas R. Pierce, Esq.
Michael D. Oesterle, Esq.
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
(615) 259-3456
dpierce@kingballow.com
moesterle@kingballow.com

Kirsten E. Small, Esq.
NEXSEN PRUET, LLC
104 South Main Street, Suite 900
Greenville, South Carolina 29601
(864) 282-1112
ksmall@nexsenpruet.com

*Counsel for Defendant/Appellant Stromberg Metal Works, Inc.*

# TABLE OF CONTENTS

**Page No.**

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ....................................................................................2

STATEMENT OF THE CASE ...............................................................................2

   Procedural History ..........................................................................................2

Statement of Facts ..................................................................................................3

   1. The Parties ................................................................................................3

   2. The CBA, its Classifications and Contribution Rates ..............................4

   3. Resolution 78 Agreements Change Classification Ratios ........................7

   4. Temporary Workers .................................................................................8

   5. Grievance Agreement Modifies the CBA ..............................................11

   6. Stromberg Contributions Met and Even Exceeded the Ratios ...............17

SUMMARY OF ARGUMENT ............................................................................20

ARGUMENT ........................................................................................................23

   Standard of Review ......................................................................................23

I. THE LOWER COURT ERRED IN ITS APPLICATION OF THE
"DEFAULT" RATIO" ........................................................................................25

   A. The lower court erred in considering Plaintiff's hearsay evidence ..........25

   B. Plaintiffs' alleged audit reports were unauthenticated, inaccurate
      and hearsay ............................................................................................29

   C. The lower court ignored contrary evidence .............................................34

II. THE RATIOS DO NOT APPLY TO CONTRIBUTIONS ...........................37

   A. Plaintiffs Lack Standing to Enforce Such Ratio Clauses .........................38

   B. The plain language of the CBA does not allow reliance upon ratios
      for contributions ....................................................................................40

III. THE GRIEVANCE AGREEMENT ALSO MODIFIED THE CBA
........................................................................................................................44

CONCLUSION .....................................................................................................50

# TABLE OF AUTHORITIES

**Page No.**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................23

*Baker v. Martin*,
  330 N.C. 331, 410 S.E.2d 887 (1991) ....................................................48

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery,* 118 F.3d 1018 (4th Cir. 1997) ...................................... 27, 41

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*,
  929 F.3d 135 (4th Cir. 2019) ................................................... 39, 40, 42

*Blackburn v. Trs. of Guilford Tech. Cmty. Coll.*,
  822 F. Supp. 2d 539 (M.D.N.C. 2011) ...............................................48

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................23

*Central Penn. Teamsters Pension Fund v. W & L Sales, Inc.*,
  728 F. Supp. 820 (E.D. Pa. 1991) ........................................................27

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) .................................................................39

*Hoffman v. Applicators Sales & Serv., Inc.*,
  439 F.3d 9 (1st Cir. 2006) .............................................................. 32, 33

*Jacobs v. N.C. Admin. Office of the Courts*,
  780 F.3d 562 (4th Cir. 2015) ........................................................ 24, 35

*Kennedy v. Joy Techs., Inc.*,
  269 F. App'x 302 (4th Cir. 2008) .........................................................24

*Libertarian Party of Va. v. Judd*,
  718 F.3d 308 (4th Cir. 2013) ...............................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...............................................................................23

*Monahan v. County of Chesterfield*,
　　95 F.3d 1263 (4th Cir. 1996)..................................................24

*Morell v. Riefkohl*,
　　651 F. Supp. 134 (D.P.R. 1986) .............................................33

*Nat'l Elec. Ben. Fund v. Rabey Elec. Co.*,
　　No. 11-cv-00184, 2012 WL 3854932 (D. Md. Sept. 4, 2012)............... 31, 34, 36

*Parkway 1046, LLC v. U.S. Home Corp.*,
　　961 F.3d 301 (4th Cir. 2020)..................................................46

*Pitt Cnty. v. Hotels.Com, L.P.*,
　　553 F.3d 308 (4th Cir. 2009)..................................................49

*Rossignol v. Voorhaar*,
　　316 F.3d. 516 (4th Cir. 2003)..................................................24

*Sakaria v. Trans World Airlines*,
　　8 F.3d 164 (4th Cir. 1993)....................................................33

*Scott v. Harris*,
　　 550 U.S. 372 (2007) ...........................................................23

*Spokeo, Inc. v. Robins*,
　　578 U.S. 330 (2016)......................................................... 38, 40

*Stone v. Liberty Mutual Ins. Co.*,
　　105 F.3d 188 (4th Cir. 1997)..................................................24

*Thompson v. Potomac Elec. Power Co.*,
　　312 F.3d 645 (4th Cir. 2002)..................................................23

*Trustees of Painters Union Deposit Fund v. Ybarra Constr. Co.*,
　　113 F. App'x 664 (6th Cir. 2004) ....................................... 34, 36, 37

*Trustees. of the Constr. Indus. & Laborers Health & Welfare Trust v. Interstate Hotel Installation*, No. 2:12-cv-00353-MMD-GWF, 2013 U.S. Dist. LEXIS 30230 (D. Nev. Mar. 5, 2013 .......................................47

*Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*,
　　476 F.3d 231 (4th Cir. 2007)..................................................46

*Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013)................33

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

29 U.S.C. § 1132(a)(3) ....................................................................38

29 U.S.C. § 1132(e) & (f) .................................................................1

29 U.S.C. § 185(a) .............................................................................1

29 U.S.C. § 186(c)(5) ........................................................................3

29 U.S.C. § 186(c)(9) ........................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................23

Fed. R. Civ. P. 56(e) ........................................................................33

Fed. R. Evid. 803(8) ........................................................................31

Fed. R. Evid. 901(a) ........................................................................32

## JURISDICTIONAL STATEMENT

Plaintiffs (collectively "the Funds" or "Plaintiffs") are eight multi-employer funds that filed this case pursuant to the Employer Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e) & (f), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), alleging that an audit revealed they were due additional contributions from Defendant Stromberg Metal Works, Inc., ("Stromberg"). Jurisdiction was proper in the district court because the matter involves a federal question. *See* 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal from a final decision of the United States District Court for the Eastern District of North Carolina (Judge Terrence Boyle) entered on September 22, 2021. Final judgment was entered by the clerk of the District Court based upon that decision on September 23, 2021.

Stromberg filed a timely Notice of Appeal on October 6, 2021, which the District Court clerk transmitted to this Court on that same date.

This appeal is from a final order of the District Court that disposes of all the parties' claims,[1] except that after Stromberg filed its Notice of Appeal, the Funds

---

[1] Plaintiffs originally sued three other defendants, but then dismissed those three defendants before the district court entered judgment (Joint Appendix p. 2202) (cited herein as "App. ___"). Therefore, those three are not parties to this appeal.

presented a motion for attorneys' fees to the District Court, which that court has denied without prejudice pending resolution of this appeal.

## STATEMENT OF ISSUES

I.  **Whether the lower court erred in relying upon Plaintiffs' inadmissible hearsay evidence and ignoring Stromberg's contrary admissible evidence**

II. **Whether employee ratios have any affect upon contributions to Plaintiffs**

III. **Whether a grievance settlement agreement modified Stromberg's obligation to contribute to Plaintiffs**

## STATEMENT OF THE CASE

### Procedural History

Plaintiffs filed this case on November 1, 2019, in the United States District Court for the Middle District of Tennessee. (App. 23). Stromberg filed a motion to have this case transferred. However, the Tennessee court required that the parties engage in discovery pending a resolution of the transfer motion. On March 1, 2021, the Tennessee court transferred this case to the North Carolina Court (App. 2181), and that Court entered its summary judgment order on September 23, 2021, awarding Plaintiffs $823,658.24 in delinquent contributions and $430,658.16 in liquidated damages and interest (App. 2200).

## Statement of Facts

### 1. The Parties

Plaintiffs Sheet Metal Workers' Health Fund of North Carolina ("Health Fund"), Sheet Metal Workers' Union Training Fund of North Carolina ("Apprenticeship Fund"), National Stabilization Agreement of 2Sheet Metal Workers' International ("SASMI"), and Sheet Metal Workers' International Scholarship Fund ("SMWISF") are employee welfare benefit plans under ERISA. (App. 24-26).

Plaintiffs Sheet Metal Workers' National Pension Fund ("Pension Fund") and International Training Institute for Sheet Metal and Air Conditioning Industry ("ITI") are employee benefit plans under ERISA. (App. 25).

Plaintiff National Energy Management Institute Committee for the Sheet Metal and Air Conditioning Industry ("NEMIC") is a not-for-profit joint labor-management organization established pursuant to the Labor Management Cooperation Act of 1978 and 29 U.S.C. § 186(c)(9). Plaintiff Sheet Metal Occupational Health Institute Trust ("SMOHIT") is a joint labor-management health and safety organization established under 29 U.S.C. § 186(c)(5) (App. 25).

Appellant Stromberg is a commercial sheet metal fabrication and installation company with a regional office in North Carolina. Stromberg is often a subcontractor on construction projects. (App. 58). Stromberg employed four classifications of

3

employees represented by Local No. 5 (the "union" or "Local 5") of Sheet Metal Air, Rail and Transport International Union ("SMART"). (App. 59). This dispute involves two major construction projects and approximately three smaller construction projects at which Stromberg worked in North Carolina. (App. 58). One of the major projects was in Chapel Hill, North Carolina, referred to as "Mary Ellen Jones." (App. 729). The other major project was in New Bern, North Carolina, referred to as "New Bern." (App. 733).

## 2. The CBA, its Classifications and Contribution Rates

Local 5 and Stromberg entered into a Standard Form of Union Agreement ("SFUA") collective bargaining agreement ("CBA") covering May 2016 to May 2019. (App. 59). The CBA sets certain benefit contribution rates to the Funds. (App. 514-15). The CBA and other labor agreements between Local 5 and Stromberg define the classifications of employees for whom Stromberg is required to make contributions to the Funds. (App. 1477). The obligation to contribute to Plaintiffs are only required for employees working under the CBA and the other labor agreements between Local 5 and Stromberg. (App. 1511-12).

The CBA identifies only four classifications of employees: Journeyman, Apprentice, Pre-apprentice, and Classified. (App. 60, 498). The CBA sets ratios for these employee classifications for each job. (App. 525). The CBA states the ratio of

employees will be one Journeyman for every two non-Journeyman, or "1:2." (App. 99).

A Journeyman under the CBA is a designated status that is not determined by trade skill, seniority or compensation. (App. 60). A person can be an extremely capable sheet metal worker with decades of experience and paid high wages, yet still not be a Journeyman. (App. 60). If someone has a Journeyman classification designation, Local 5 will have designated that individual as such. (*Id.*).

An Apprentice under the CBA is someone indentured in the apprenticeship program administered by the Plaintiff Apprenticeship Fund. (App. 499, 714). Apprentices serve an apprenticeship of up to five years, but two-year credit is sometimes given for prior experience. (App. 501, 714). An Apprentice is not in charge of work on any job and works under a Journeyman. (*Id*.). Local 5 retains the information on all individuals who have completed the apprenticeship program and who have become Journeymen because they completed their apprenticeship. (App. 555).

A Pre-apprentice under the CBA is an individual who has no prior experience and is enrolled in the Apprenticeship Fund's program for future openings in the apprenticeship program. (App. 504, 715).

Under the CBA, a Stromberg employee who is not a Journeyman, Apprentice or Pre-apprentice is necessarily a Classified employee. (App. 509). A Classified

5

employee under the CBA may be an individual hired off the street as a Stromberg employee. A Classified employee is paid between 40 and 95 percent of the Journeyman's pay. (App. 504, 583, 715, 722). Classified employees may perform any work covered by the CBA of which they are capable and work under the general direction of a Journeyman. (App. 504, 715, 722). A Classified employee can have no experience or can have a great deal of experience. (App. 505).

The CBA provides two ways in which an individual can become a Journeyman for the purposes of the CBA, such as entering and completing the Apprenticeship Fund's program, or pursuant to Section 27 of the CBA Addendum. (App. 63-64). Under Section 27, titled "Classified Workers—A path to become a Journeyman," a Classified employee who would like to become a Journeyman can do so by following certain steps, however, Local 5 and Stromberg would have to jointly agree to allow a Classified employee to receive the Journeyman designation. (*Id.*).

Stromberg's required hourly contributions to the Funds are less for Classified employees than for Journeymen. (App. 506). Required contributions for Pre-apprentices are the same as required contributions for Classified employees. (App. 519). The contributions required under the CBA for Classified employees with a great deal of experience are the same as the contributions required for Classified employees with no experience. (App. 506). Employer contributions for Pre-

apprentices and Classified for the Health Fund and the Pension Fund are required only after the first payroll period after they have completed ninety (90) days of employment. (App. 98, 724).  There is no such waiting period for Journeymen and Apprentices. (App. 1510).

Consistent with the different contribution rates, the Funds provide different levels of benefits depending upon employee classifications. (App. 60). Thus, consistent with the higher contribution rate, Journeymen receive a higher level of benefits than Apprentices, Pre-apprentices, and Classified employees. (*Id.*). Likewise, consistent with the 90-day waiting period for contributions, Classified employees and Pre-apprentices do not receive benefits during their first 90-days of employment, whereas Journeymen and Apprentices, for whom contributions are made from the first day of employment, do not have this waiting period for benefits. (App. 1513).

### 3. Resolution 78 Agreements Change Classification Ratios

Resolution 78 Agreements are recognized in the union sheet metal industry as local agreements between an employer, such as Stromberg, and a SMART local, such as Local 5, to amend the terms of the CBA as applicable to a particular job site. (App. 458). Resolution 78 Agreements commonly make CBA terms more favorable to the employer in order to allow that employer to competitively bid against  non-union employers. (App. 458). Stromberg and Local 5 entered into Resolution 78

7

Agreements for the Mary Ellen Jones project (App. 729-32) and the New Bern project (App. 733-34). Each Resolution 78 Agreement was entered into prior to the start of the project, and each set out terms more favorable to Stromberg than otherwise found in the CBA, including on the employee classification ratios. (App. 436, 707-10, 711-12).

The Resolution 78 Agreements between Local 5 and Stromberg amended the CBA classification ratio for those two specific jobsites. (App. 527). In this litigation, significantly, Plaintiffs have admitted each of the Resolution 78s constitute binding CBA modifications that govern Fund contributions for those projects. (App. 185-86). For these two jobs, the Resolution 78 Agreements changed the 1:2 CBA ratio to 1 Journeyman to 4 other non-Journeyman classifications, or "1:4." (App. 729, 733).

### 4. Temporary Workers

The CBA requires Local 5 to furnish to Stromberg upon request duly qualified Journeymen, Apprentice, Pre-apprentice, and Classified employees. (App. 509, 61). Local 5 is required to furnish these employees to Stromberg within 48 hours of the request. (App. 510). The manpower request begins under Article IV of the CBA with Stromberg requesting a particular classification of employee from Local 5. (App. 79, 584). Local 5 will then write up a referral for an individual at an agreed-upon wage rate for the classification. (App. 584). A referral is a document that refers a member

8

to a contractor after the request and identifies the employee's classification and wage rate. (App. 1231). If Local 5 is unable to fulfill the manpower request within 48 hours, the CBA entitles Stromberg to hire an employee off the street. An employee hired in this manner is a Classified employee under the CBA. (App. 79). Stromberg would send the new employee to Local 5 to complete paperwork and Local 5 would send the employee back to Stromberg with a copy of the referral. (App. 79, 584).

Stromberg made referral requests for manpower often a month in advance for different projects. (App. 604). However, Local 5 consistently failed to meet its obligation under the CBA to provide to Stromberg requested employees, including Apprentices, within 48 hours because the union lacked adequate resources. (App. 61, 511).

Local 5 acknowledges that the classification ratios are difficult to obtain and maintain, as they are a moving target. (App. 533). The required ratios under the CBA and Resolution 78s do not always work out due to the number of employees at a given jobsite. (App. 534). Even if the ratios do not meet the ratios under the CBA and/or Resolution 78s, a non-Journeyman will not be deemed a Journeyman to satisfy the classification ratios. (App. 532).

Local 5 was aware that due to the failure to provide requested manpower, Stromberg began using workers employed by temporary staffing services companies ("Temporary Workers"). (App. 612). Local 5 first learned of Stromberg using these

Temporary Workers in 2016. (App. 1182). Several of the Temporary Workers utilized by Stromberg would not have been eligible for contributions even if they were treated as Stromberg Classified employees because they worked less than 90 days. (App. 2051).

Stromberg utilized these Temporary Workers at the Mary Ellen Jones and New Bern jobsites in North Carolina, in part due to Local 5's failure to provide the required manpower. (App. 61). Local 5 understood the temporary staffing companies covered taxes, wages, benefits, insurance, and workman's compensation for the Temporary Employees. (App. 1245). Stromberg did not pay wages to these Temporary Workers; instead, it paid their respective temporary company a contract fee for the Temporary Workers' services. (App. 627). Stromberg did not directly hire or fire the Temporary Workers. (App. 61). Stromberg did not provide leave or other benefits to the Temporary Workers. (App. 61). Stromberg did not pay payroll taxes or social security taxes on the Temporary Workers. (App. 1329). Stromberg did not select which Temporary Workers it received from the temporary staffing agency. (App. 1330). The Temporary Workers were not subject to the same disciplinary process afforded to Stromberg employees. (App. 61).

None of the Temporary Workers used by Stromberg were Journeymen, Apprentices or Pre-Apprentices. (App. 64). Local 5 maintains a list of those persons who have Journeyman status and none of the Temporary Workers were on that list.

(App. 549). None of the Temporary Workers used by Stromberg pursued any of the ways under the CBA to become a Journeyman while they were utilized at a Stromberg project. (App. 63-64).

### 5. Grievance Agreement Modifies the CBA

In April 2017, Local 5 and Stromberg filed grievances against one another that included Local 5's complaint about benefit contributions and the Temporary Workers, and Stromberg's complaint that Local 5 could not provide manpower needs in the ratios agreed to under the Resolution 78s or the CBA. (App. 61-62, 616, 811-12). Stromberg and Local 5 resolved the grievances via settlement on July 14, 2017, which had each withdrawing their respective grievance. (App. 619). In the July 14, 2017, Grievance Settlement Agreement, Local 5 agreed not to seek any remedy for Stromberg using the staffing companies' Temporary Workers, i.e., for subcontracting the work. (App. 622). Stromberg agreed not to seek any remedy for Local 5's failure to meet the manpower requests. (*Id.*). Local 5 agreed that grievance settlements modify the CBA. (App. 624).

There were continuing issues after July 14, 2017 with Local 5 supplying qualified manpower. (App. 40, 624). In August 2017, Local 5 was aware that the manpower they were sending was unacceptable. (App. 635). Stromberg repeatedly sent various letters requesting manpower from Local 5 and Local 5 frequently sent unqualified manpower. (App. 629). There were numerous emails documenting

11

problems with employees provided by Local 5. (App. 677). As a result, Stromberg had to continue using Temporary Workers to maintain sufficient manpower to complete its projects. (App. 62).

Local 5 filed another grievance on October 22, 2018, relating to Stromberg's use of the Temporary Workers. (App. 656, 62). That grievance set forth the "nature of grievance" in Item 7:

> Company is in violation of the Standard Form of Union Agreement with Local 5 by circumventing the Hiring Hall procedures, and subcontracting installation of bargaining unit work to companies/employees not signatory with Local 5. The Union request (sic) that Stromberg makes Local 5 whole for all lost wages, benefits, assessments, and damages caused by the violation of the SFUA.

(App. 870). In Item 7 of the 2018 grievance, Local 5 expressly stated Stromberg was "subcontracting" work in violation of Article II, Sections 1 and 2 of the CBA. (App. 462-63, 870).

Local 5's 2018 grievance specifically set forth in Item 8 the Articles and Sections of the "SFUA," and Addendum Sections allegedly violated by Stromberg as set forth in Item 7, "nature of grievance." (*Id.*). The specific Articles, Sections, and Addendum Sections listed in Item 8 alleged to have been violated include subcontracting and provisions setting forth the contribution obligations and rates applicable to the classification of employees. (*Id.*).

A grievance meeting over the 2018 grievance was held on December 18, 2018. (App. 62, 462, 660). Joseph Powell, William Blank, Larry Gregory, Jerry Robinson,

12

Kathleen Bigelow, Don Dette, Chris Griffey and Karla Campbell were present for the 2018 grievance meeting. (App. 661, 62, 462). Karla Campbell (Plaintiffs' lead counsel in this case) attended the grievance meeting on behalf of Plaintiff Health Fund. (App. 661). Karla Campbell was the only person attending the meeting on behalf of the Health Fund. (App. 663). Joseph Powell is a trustee of the Plaintiff Pension Fund. (App. 62, 456). Powell was also a representative of the SMART International Union. (App. 62). Don Dette was the Coordinator of Plaintiff Apprenticeship Fund and a Local 5 Representative. (App. 1999).

Joye Blanscett is the Director of Labor Services and Human Resources Management for the Sheet Metal and Air Conditioning Contractors National Association, commonly referred to as "SMACNA". (App. 455-56). One of the services SMACNA provides is assistance to its members, like Stromberg, in the area of labor relations, including grievance resolution efforts. (*Id.*).

Local 5 and Stromberg reached a resolution of the 2018 grievance during the December 18, 2018 meeting. (App. 457). Blanscett prepared an initial draft of the written settlement agreement to be executed between Stromberg and Local 5. (App. 457). Blanscett forwarded this initial draft of the settlement agreement to Joseph Powell for review and comment to ensure the accuracy of the settlement terms. (App. 457). On January 3, 2019, Powell sent an email to Lori Wood of Plaintiff Pension Fund and Chris Griffey outlining what the parties agreed to at the meeting to resolve

the grievance and its issues. (App. 62, 446-47). Powell's January 3, 2019, email acknowledges that the parties agreed that the provisions of the eventual grievance settlement agreement would be retroactive. (App. 62, 463). Powell made a few changes to the terms of the draft settlement agreement that Blanscett incorporated into the final settlement agreement. (App. 457).

The 2018 grievance was ultimately settled on January 14, 2019, with a signed settlement agreement (the "Grievance Agreement"). (App. 63, 457, 498, 660, 872-73). Paragraph 1 of the Grievance Agreement identifies the projects, Mary Ellen Jones and New Bern, which had Resolution 78 terms different than the CBA. (App. 458, 463). Paragraph 3 of the Grievance Agreement refers to the Resolution 78 projects and means that if Local 5 was unable to provide an Apprentice at any time when requested during these two Resolution 78 projects so the 1:4 ratio could not be met at those projects, then Stromberg could have used a Classified employee instead of an Apprentice to fulfill the ratio. (App. 446-47, 458, 464). Paragraph 15 refers to the prospective use, through a Resolution 78, of a temporary agency for Temporary Workers if another manpower shortage should occur at a future project or work site. (App. 458). Paragraph 14 of the Grievance Agreement confirms that Stromberg agreed to cease using all Temporary Workers by January 31, 2019, and in return, Local 5 agreed to withdraw the grievance against Stromberg related to the Temporary Workers and agreed not to go back against Stromberg for "working dues,

14

lost wages etc." based on the use of Temporary Workers. (App. 63, 458). Paragraph 14 of the Grievance Agreement resolved all issues raised in the grievance, including the subcontracting of work done by the Temporary Workers, and controlled Fund contributions. (App. 63, 458).

Paragraph 5 of the Grievance Agreement specifically addresses past contributions to any trust fund. Paragraph 5 acknowledges back contributions may be owed to the local training fund for Classified employees at all job sites for hours worked after May 1, 2016. There, the parties agreed that a $.25/hour contribution to the local training fund would "be paid from day one for classified workers," and that Stromberg would resolve "any back contribution amounts that might be owed" for that one particular fund. (App. 458-59, 465). The Grievance Agreement distinguished between "temporary workers" and "temporary employees." (App. 672). The Agreement further acknowledges that the Temporary Workers Stromberg had previously used before January 31, 2019, were not Stromberg "employees" but rather were "workers." (App. 63, 465).

In Paragraph 15, Stromberg and Local 5 specifically agreed that if it were necessary in the future to alleviate a worker shortage, that Stromberg would use "temporary *employees*." (App. 465) (emphasis added). The use of these two different terms (i.e., "workers" and "employees") was not inadvertent; rather they had specific meaning because of the parties' CBA. (*Id.*). The union understood that there is a

15

difference between temporary employees and Temporary Workers. (App. 672). There is nothing in the January 14, 2019, Grievance Agreement that suggests that Plaintiffs would pursue contributions for Stromberg's use of the Temporary Workers, who are not employees of Stromberg. (App. 674).

From the beginning of the first grievance in April 2017, Stromberg made contributions on behalf of the Temporary Workers, even though they were not Stromberg employees. (App. 29, 466). The Plaintiff Health Fund set aside all of the contributions made by Stromberg for the Temporary Workers, ostensibly because the Fund cannot accept contributions for non-employees. (App. 1454). Each of the Plaintiffs' Trust documents allow contributions for only Stromberg's employees, and for non-employees (App. 193, 194, 203, 224-25, 236, 268, 279, 291, 308-09, 335, 352, 370, 3579 395, 407-08, 430, 449-50, 451-54) and, and those contributions must be made pursuant to the CBA which limits contributions to employees. (e.g., App. 82-84, §§ 12b, 13a, 14, 15).

The Temporary Workers used by Stromberg have expressly stated that they did not want any of the benefits provided by the Plaintiffs. (App. 1345). As of September 10, 2020, none of the Temporary Workers used by Stromberg have made any claims for benefits under the Health Fund. (App. 1523). There is no proof that any of the Temporary Workers have sought any benefits or any right to any benefits from any of the Plaintiffs' Funds. (App. 63). With each passing day, it becomes less

16

likely that a claim for benefits will be made by any of the Temporary Workers used by Stromberg. (App. 1523).

### 6. Stromberg Contributions Met and Even Exceeded the Ratios

From April 2017 to February 2019, Stromberg made contributions to Plaintiffs' Funds as though the Temporary Workers were Classified employees at Stromberg. (App. 446). Because none of the Temporary Workers were Journeyman, Apprentices or Pre-apprentices, they would necessarily have to be Classified employees, and so that is how Stromberg calculated the contribution rate for these Temporary Workers. (*Id.*). Stromberg did not believe at that time Stromberg owed any contributions for these non-employee Temporary Workers, but Local 5 thought otherwise, so Stromberg made the Classified employee level of contribution to Plaintiffs simply to "buy its peace" in the workplace. (*Id.*). The Classified employee rate of contribution, including the 90-day waiting period, made these contributions minimal compared to the Journeyman contribution rate Plaintiffs seek in this case. (*Id.*).

Additionally, Kathy Bigelow has verified that at no time within the audit period did the classification ratios at either Resolution 78 jobsite exceed the 1:4 ratio of Journeymen to lesser classifications. (App. 467). Bigelow has also verified that at no time within the audit period did the classification ratio exceed the 1:2 ratio at any non-Resolution 78 jobsite. (*Id.*). Bigelow routinely made the contribution

17

calculations at Stromberg, and she has personal, first-hand knowledge of these matters. Consistent with these ratios, and in connection with Plaintiffs' audit, Bigelow found that Stromberg actually over contributed to the Funds. (App. 2050).

Plaintiffs had an independent auditing firm, Calibre CPA Group, audit Stromberg contributions. Plaintiffs have offered no evidence from Calibre. Rather, Plaintiffs offered Declarations of three persons who have no personal knowledge of what records the auditors reviewed or found. (App. 1999, 2001-02, 2032). None of these declarants (Kenneth Anderson, Deanna Morris and Don Dette) were auditors for Plaintiffs or performed the audit. (*Id.*, 1487-88). They each admitted that any information they had concerning any allegedly delinquent contributions came from the Calibre auditors. (*Id.*). The documents Plaintiffs have submitted as exhibits to the Declarations of Anderson and Morris[2] that purport to be audit reports treat all the Temporary Workers as Journeymen, which is inconsistent with the CBA and Resolution 78 ratios. (App. 2050). Moreover, Bigelow testified the exhibits to the Anderson and Morris Declarations, which are neither identified nor authenticated, seemingly to suggest audit calculations, are inaccurate. (App. 2050).

Further, Anderson stated that "Stromberg did not produce payroll records that would permit the auditor to apply the Resolution 78 variances to the audits." (App.

---

[2] Dette's Declaration had no attachment, but like Anderson and Morris admits his conclusions were based upon the Calibre audit. (App. 1999).

2002). Bigelow also testified this was a false statement. (App. 2049-50). Anderson was not one of the auditors and he never communicated with Stromberg about the audit. (*Id.*). Therefore, he would have no information other than hearsay about what Stromberg made available to the auditors. (*Id.*). The payroll records Stromberg made available to Plaintiffs' auditors contained sufficient information from which the auditor could have applied the Resolution 78 variances. (*Id.*). Moreover, if the auditors were unable to understand any of the information (or if they needed additional information) Stromberg would have provided them with requisite information. (*Id.*).

### 7. Plaintiffs' Claim

Several months after attending the 2018 grievance meeting that resulted in the Grievance Agreement, Plaintiffs' counsel filed this case stating that Stromberg was "paying contributions on [the Temporary Workers'] behalf to the Funds at the classified worker rate." (App. 29). The gravamen of their Complaint states, "Stromberg's treatment of the Temporary Employees as classified workers results in a very high number of classified workers on the job site as compared to journeymen and apprentices on the site, which violates the 1:2 ratio established by the CBAs." (App. 30). Plaintiffs' penultimate allegation states that the Funds have been "deprived…of contributions due and owing for covered work at the agreed-upon ratio." (App. 31).

19

The CBA ratio section states, in its entirety, "Section 30. Effective May 1, 2012: 1 to 2 ratios. The ratio to Journeyman shall be one (1) Journeyman to one (1) Apprentice and one (1) Classified Worker or one (1) Pre-apprentice." (App. 99). This section contains no mention of contributions. Moreover, although the CBA also discusses contribution rate with great specificity as to particular classifications (i.e., App. 94-95) at no time does the CBA or the Resolution 78s ever suggest that ratios relate to or have any effect on contributions. The other party to the CBA and Resolution 78s, Local 5, admits the ratios exist in those agreements to achieve "a certain level of productivity and skill on the job" and for no other purpose. (App. 525).

## SUMMARY OF ARGUMENT

The lower court granted summary judgment to Plaintiffs after erroneously ruling two points were undisputed: First, that audit reports showed Stromberg owed more contributions, and second, that Stromberg had not maintained adequate payroll records to allow a contradiction of those audit reports. Yet Stromberg offered unequivocal testimony disputing both these points. Therefore, these disputed material facts should have precluded summary judgment for Plaintiffs. Moreover, because Plaintiffs' proof on these two points was inadmissible hearsay and Stromberg's contrary proof showing that it did not owe more contributions was admissible evidence, summary judgment should have been granted in favor of

Stromberg.

Further, Plaintiffs admitted they were bound by the Resolution 78s, however the lower court refused to apply the 1:4 ratio of those Resolution 78s, and instead applied the "default" 1:2 ratio of the CBA. The lower court rationalized this decision stating that Stromberg did not maintain adequate payroll records to apply the 1:4 ratios and any determination of an employee's job classification would depend on the skill level of the employee. Nothing in the record supports a conclusion that job classifications are dependent upon skill level; indeed, the record is to the contrary. Moreover, if any job classification and resulting ratio did depend upon employee skill level, this would be equally true for both the 1:2 as well as the 1:4 ratio. Therefore, the lower court's decision is inherently inconsistent, in addition to being contrary to the undisputed evidence.

Finally, ratios do not control employer contributions to the Funds. The CBA makes clear that contributions are determined by job classifications regardless of what ratio those classifications create. Not only does the plain language of the CBA establish this point, but this interpretation avoids the need to calculate ratios, which even Plaintiffs admit they have been unable to do. Moreover, basing contributions on classifications is logical because the benefits Plaintiffs provide to employees are based upon classifications, not ratios: i.e., contributions are greater for Journeymen, and they receive greater benefits. For this reason also, Stromberg is entitled to

summary judgment because it is undisputed its contributions matched job classifications.

Alternatively, the Grievance Agreement resolving the 2018 grievance constituted a valid modification of the CBA as it relates to contributions. Stromberg met its contribution obligation under the Grievance Agreement.

# ARGUMENT

## Standard of Review

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party…and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co*., 312 F.3d 645,

649 (4th Cir. 2002). When deciding cross-motions for summary judgment, a court considers each motion separately and resolves all factual disputes and competing inferences in the light most favorable to the opposing party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

"Summary judgment cannot be granted merely because the court believes the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). "The court therefore cannot weigh the evidence or make credibility determinations." *Id.* at 569. Significant in this case, Declarations used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out fact would be admissible at trial and show that the … declarant is competent to testify on the matter stated" Fed . R. Civ P. 56(c)(4). Therefore, the court cannot rely upon hearsay on a motion for summary judgment.

This Court reviews the entry of summary judgment *de novo*, applying the same standard as the district court. *Stone v. Liberty Mutual Ins. Co*., 105 F.3d 188, 190-91 (4th Cir. 1997). When reviewing cross-motions for summary judgment, this Court may, if appropriate, direct entry of judgment in favor of the party whose motion was denied by the district court. *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996).

# I.

## THE LOWER COURT ERRED IN ITS APPLICATION OF THE "DEFAULT RATIO"

### A.    The lower court erred in considering Plaintiffs' hearsay evidence

The district court correctly acknowledged that the Resolution 78s were valid modifications to the CBA. (App. 2185). Specifically, Plaintiffs admitted pursuant to Federal Rule of Civil Procedure 36 that each of the Resolution 78s "constitute[d] valid modifications of" the CBA. (App. 184-86). Further, Plaintiffs agree each of the Resolution 78s "govern the amount of contributions Stromberg was required to make to Plaintiffs during the time period for which Plaintiffs have sought delinquent contributions in this case." (App. 185-86). However, the district court concluded Plaintiffs were not required to apply the 1:4 ratio contained in those Resolution 78s because the court stated Stromberg had not maintained adequate records to allow the auditor to determine who was a Journeyman or other classification while on jobs. (App. 2197). This finding is completely contrary to the undisputed evidence.

The lower court entered judgment based upon Plaintiffs' hearsay evidence that not only did not apply the Resolution 78 1:4 ratio, but also applied no ratio of any kind and treated all Temporary Workers as Journeymen. (App. 2051). Yet none of these Temporary Workers were Journeymen even if they are deemed employees for the purposes of ERISA as the district court incorrectly concluded; rather, they were all Classified employees.

25

The lower court stated:

> [t]he Court considers Stromberg's argument that it should not be required to pay the journeyman rate for any work hours. The Funds contend that they do not know whether any of the individual workers are journeymen, and that they have no way of knowing an individual workers' skill level. Rather, plaintiffs contend that they are entitled to rely on the default ratio established by the CBA. The Court agrees with plaintiffs, as all of the relevant case law supports that in Section 515 actions the plaintiff benefits funds should not be required to "comb through the records" to determine how much in delinquent contributions they are owed.

(App. 2197). It is undisputed that skill level does not determine whether someone is a Journeyman: it is a designated status granted and recorded by Local 5. (App. 60). If the auditor truly did not know whether someone was a Journeyman, all Plaintiffs or their auditors had to do was send a list of the names in question to Local 5 to confirm who was a Journeyman. Further, the Plaintiff Apprenticeship Fund can identify who is an Apprentice or Pre-apprentice.

The above-quoted passage also reflects the lower court's misunderstanding when it referred to "the default ratio established by the CBA." While incorrect reasoning, the default ratio would be the 1:2 CBA ratio instead of the 1:4 ratio in the Resolution 78s. Yet, this is not what Plaintiffs' auditors did. Rather, Plaintiffs' auditors treated all the employees (including the Temporary Workers) as Journeymen, which is to say Plaintiffs applied no ratio. Therefore, by relying upon the alleged auditors' report (and there is no competent evidence of such report in the record), the district court took a position that is contrary to both the CBA and the

26

Resolution 78s. Apparently, the district court believed that the 1:4 ratio would otherwise control, but in this case, the auditors were free to ignore those ratios. Presumably, the court believed the 1:4 ratio could be ignored because it would require Plaintiffs' auditors to 'comb through the records' to determine how much in delinquent contributions they are owed. (App. 2197). Yet, this is precisely what an audit is for. Otherwise, an auditor must blindly accept as true everything the employer reports, or as in this case, blindly conclude as false everything Stromberg reports.

Moreover, there was no "combing" to be done in this case and the lower court cited no part of the factual record to suggest otherwise. Stromberg had reported all the Temporary Workers as Classified employees and made contributions on that level, and all the auditors had to do was confirm with Local 5 whether any were Journeymen. Plaintiffs have not, and cannot, explain how they will have to comb through any records to obtain an employee's classification. Nor can the court.

Also, the court provided no citation to its "comb through the records" quotation. To the extent that it was referring to *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery,* 118 F.3d 1018, 1024 (4th Cir. 1997) (citing *Central Penn. Teamsters Pension Fund v. W & L Sales, Inc.,* 728 F. Supp. 820, 830 (E.D. Pa. 1991)), neither of those cases involved combing through records, but rather reviewing a CBA. *Ralph's Grocery*, 118 F.3d at 1024 (Fund "not required

27

to comb through other parts of the collective bargaining agreement"); *W & L Sales*, 778 F. Supp. at 830 ("reasonable for plaintiffs . . . to have confined their inspection to that part of the collective bargaining agreement which concerned pensions").

Therefore, the lower court's suggestion that Plaintiffs were entitled to apply the "default rate" of the CBA completely misses the mark because that is not what Plaintiffs did. Rather they applied no ratio: they treated *all* Temporary Workers as Journeymen even though it was a simple matter to establish that *none* were Journeymen.

Although the lower court said it was applying the "default" 1:2 ratio, it is clear from the court's analysis that it did not. There is no doubt that the lower court actually accepted Plaintiffs' current position that all Temporary Workers be treated as Journeymen and that there be no ratios because of the lower court's statement that Plaintiffs could not determine classification because Plaintiffs would "have no way of knowing an individual worker's skill level." (App. 2197). If Plaintiffs were going to apply any ratio, and if skill level were an appropriate means of determining who was a Journeyman, Plaintiffs would still have to know employee skill level to apply the "default" 1:2 ratio. But by ruling that Plaintiffs would not know the skill level, the district court erroneously accepted Plaintiffs' position that no ratios need apply and all employees would be treated as Journeymen.

**B.    Plaintiffs' alleged audit reports were unauthenticated, inaccurate and hearsay**

In another significant misunderstanding of this case, the lower court stated, "Stromberg does not contend that the *audit reports* replied [sic] upon by plaintiffs their affiants are not authentic." (App. 2199) (emphasis added). The principal problem with this statement is that **there have never been any audit reports presented in this case**. Presumably, the court was referring to the attachments to the Anderson and Morris Declarations. (App. 2004-31, 2034-47). Yet, neither of these two declarants make any reference to any exhibit to their declarations. The attachments to their declarations are neither identified nor authenticated.

To the extent that those unidentified and unauthenticated attachments could be considered authentic, Stromberg very much disputed the accuracy of those documents. (App. 2050). Bigelow testified that, "These calculations are not correct." (*Id.*). Also, Bigelow testified that these calculations "which purports to be audit reports treat all the Temporary Workers as Journeymen, which is inconsistent with the ratios set forth in both the CBA and Resolution 78 agreements." (*Id.)*. Therefore, even if those two exhibits were admissible evidence, there is a genuine issue of material fact as to whether they are accurate.

In the third paragraph of both the Anderson and Morris Declarations, these declarants make clear they are relying upon documents provided to them by out-of-court declarants, and Anderson and Morris do not provide or even offer to provide

29

those documents. (App. 2001-02, 2032-33). Then, in the fourth paragraph of their Declarations, they both state they are relying upon "portions of those documents attached to Plaintiffs' Motion for Summary Judgment." (App. 2002, 2033). But there are no documents attached to Plaintiffs' Motion for Summary Judgment. (App. 1771-73). Therefore, the Declarations submitted by Plaintiffs, in addition to being clear hearsay, are also a complete mystery.[3]

Although Plaintiffs *alleged* that Stromberg had an imbalance of employees, which might suggest being out-of-ratio, Plaintiffs offered no proof to support that allegation. Bigelow  expressly stated Stromberg was always in-ratio (App. 2050), and neither Anderson, Morris nor Dette, or anyone else, said or suggested otherwise. (App. 1999, 2001, 2032). It is understandable that Stromberg was in-ratio because it had a contractual obligation to Local 5 to be in-ratio, an obligation that was independent of, and had nothing to do with, contributions.

Yet, the principal reason those two unauthenticated and unidentified documents are not admissible is because they are hearsay. The Declarations of Morris and Anderson make very clear that whatever information they have about any audit came from the auditors, an out-of-court declarant. Accordingly, Morris

---

[3] Dette also admits that he is relying upon hearsay in paragraph 2 of his Declaration (App. 1999), and he likewise claims that he relied upon documents "attached to Plaintiffs' Motion for Summary Judgment" (App. 1999-2001) when there were no such documents.

30

and Anderson lack the ability to authenticate any audit result. All they could authenticate, if they had even made the effort, was inadmissible hearsay.

The lower court then stated:

> And Stromberg has failed to cite any "legal authority suggesting that an auditor or an affiant relying on an audit must physically observe each employee performing covered employment for a court to rely on the audit or affidavit." *Nat'l Elec. Ben. Fund v. Rabey Elec. Co.*, No. 11-CV-00184-AW, 2012 WL 3854932, at *7 (D. Md. Sept. 4, 2012).

(App. 2199). Stromberg has never suggested this. Of course an auditor does not need to physically observe workers to complete a payroll audit. But, in this case, the auditor did not offer any evidence about the audit. In *Rabey,* the employer argued "that the auditor lacked personal knowledge necessary to support the accuracy of the audit." *Id.* For the purpose of this summary judgment appeal, Stromberg does not argue that Calibre lacked personal knowledge, but Plaintiffs failed to offer any testimony from Calibre. Moreover, Anderson, Dette and Morris make clear that they lack personal knowledge to support the accuracy of the audit. *Rabey* does not even remotely suggest that an auditor's report can be offered into evidence when no one has either identified or authenticated it.

Plaintiffs are trying to silently suggest that there is a hearsay exception for payroll audit reports such as exists for public records. Fed. R. Evid. 803(8). The fact that there is no such exception confirms that Plaintiffs cannot simply take a

31

document presented to them by an out-of-court third party auditor and then begin to vouch for its authenticity and accuracy.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Neither Morris nor Anderson made any effort to even mention any documents attached to their declarations. Therefore, they made no effort to authenticate those documents, and they should have been stricken. *Hoffman v. Applicators Sales & Serv., Inc.*, 439 F.3d 9 (1st Cir. 2006).

In *Hoffman*, the court affirmed the district court ruling that an exhibit to an affidavit submitted in summary judgment proceedings "was not admissible because it was not authenticated and was based on data not authenticated or presented in the summary judgment record." *Id.* at 14. The court of appeals noted that the exhibits consisted of a chart with explanatory notes purporting to list employees, but the preparer of the list was not identified. *Id*. *Hoffman* observed "that documents do not automatically become a part of the record simply because they are the product of discovery." *Id.* at 15. Further, *Hoffman* observes that a mere claim by an affiant that his affidavit is based upon personal knowledge is not enough. *Id*. at 16.

Similarly, in this case, even if Plaintiffs had made some attempt to authenticate the documents the district court apparently believed were "audit

reports," those documents would still be inadmissible under the basic evidentiary principles stated in *Hoffman*.

"[A]ffidavits offered on a summary judgment motion are to be scrutinized carefully by courts to evaluate their probative value and to determine whether they meet the requirements prescribed in Rule 56(e)." *Morell v. Riefkohl*, 651 F. Supp. 134, 139-40 (D.P.R. 1986). Because Plaintiffs' Declarations never even mentioned that any documents are attached, and because these declarants admitted they were relying upon information provided by others, Plaintiffs' declarations are inadmissible hearsay. *See Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

Although the standards for admissibility of evidence at summary judgment were replaced with the 2010 amendment to Rule 56, hearsay is still prohibited. In *Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013), this Court affirmed the district court's finding that it would not consider an unsworn letter for purposes of its summary judgment determination. The unsworn letter was attached to an affidavit of the plaintiff who did not write the letter. *Id*. Further, the Court did not accept the plaintiff's argument that the mere notarization of the unsworn letter was sufficient to require the district court to consider it for the purpose of summary judgment and assume its truth. *Id*. The facts of *Whittaker* are substantially similar to

33

Plaintiffs' efforts to rely upon the alleged audit reports. Stromberg is not aware of any case that has allowed reliance upon documents that no one has even attempted to identify or authenticate, as Plaintiffs are seeking to do here.

The lower court also cited *Trustees of Painters Union Deposit Fund v. Ybarra Constr. Co.,* 113 F. App'x 664, 669 (6th Cir. 2004), for a proposition similar to *Rabey*. Yet, *Ybarra* makes clear the hearsay deficiency in Plaintiffs' case. In *Ybarra,* the auditor provided *deposition* testimony. *Ybarra*, 113 F. App'x at 665 n.2. Plaintiffs presented neither deposition nor other testimony from Calibre and there is no legal authority to allow the Rules of Evidence to be ignored in this case.

## C.    The lower court ignored contrary evidence

The lower court further stated:

> Stromberg also challenges the fact that the Resolution 78 ratios were not applied during the audit calculations. Plaintiffs' declarations state that the auditors did not have sufficient information to apply these ratios. Specifically, Mr. Anderson stated that "Stromberg did not produce payroll records that would permit the auditor to apply the Resolution 78 variances to the audits."

(App. 2199, quoting App. 2001). This is another clear error by the lower court. In direct response to the Anderson statement, Bigelow testified:

> This is a false statement. Mr. Anderson was not one of the auditors and he did not communicate with Stromberg about the audit. Therefore, he would have no information other than hearsay information about what Stromberg made available to the auditors. The payroll records Stromberg made available to Plaintiffs' auditor contained sufficient information from which the auditor could have applied the Resolution 78 variances. Moreover, if the auditor at any time was unable to

34

> understand this information or if they needed additional information, I would have been more than apply to answer any questions they might have had in that regard.

(App. 2049). A district court errs "by failing to consider all the evidence in the record." *Jacobs*, 780 F.3d at 569 (reversing grant of summary judgment for failing to consider contrary proof). Here, the lower court ignored Bigelow's direct contradiction of Anderson.

If this were a motor vehicle accident case dependent upon the traffic light, and Stromberg said the light was red, but Plaintiffs said the light was green, that dispute of a material fact would preclude summary judgment, which is the situation analogous to whether the auditors had sufficient information to apply the 1:4 ratio. Therefore, under no circumstance were Plaintiffs entitled to summary judgment.

But, in this case, Plaintiffs have not presented any contradictory witness. Rather, they allege that some unidentified out of court declarant told their witness that the light was green. Under those circumstances, the out-of-court declarant's statement is inadmissible. Thus, the material fact is undisputed that the light was red. In the instant case before this Court, Plaintiffs have no evidence and Stromberg's evidence is undisputed and must be accepted. Accordingly, not only are Plaintiffs not entitled to summary judgment, but Stromberg is entitled to summary judgment.

It is difficult to imagine a clearer violation of the summary judgment procedure than to grant summary judgment based upon inadmissible evidence which

is clearly disputed by admissible evidence. In relying upon the Anderson statement, the court completely ignored that this statement was unequivocally disputed, and that it was clearly inadmissible hearsay.

To the extent the lower court relied upon *Rabey* and *Ybarra* as ruling against employers who had not maintained adequate records, that concept is inapplicable here. Bigelow expressly testified that this information was provided to the auditor and the auditor has offered no contrary evidence. Rather, Anderson (who was not present at the audit) said that some unidentified person told him that Stromberg did not have such records. Once again, Anderson presented rank hearsay. Therefore, for the purposes of summary judgment, the undisputed facts show:

- Plaintiffs admitted the Resolution 78 ratios controlled
- Plaintiffs' auditors knew these ratios controlled
- The auditors did not apply those ratios
- The auditors had no reason not to apply those ratios

Accordingly, Plaintiffs' proof is hearsay as to both the alleged audit reports and the sufficiency of Stromberg records. Since Plaintiffs' entire motion for summary judgment was based upon this inadmissible hearsay, Plaintiffs' motion should have been denied, and Stromberg's motion should have been granted because it is based on admissible evidence.

The district court entered judgment with precise dollar amounts, yet the record contains no admissible evidence to support these amounts. As the case relied upon by the lower court stated, summary judgment has been described as the time to "'put

36

up or shut' up on a critical issue." *Ybarra*, 113 F. App'x at 667 (citation omitted). Because Plaintiffs relied upon hearsay evidence for the critical issue of this case, they failed to "put up" and should therefore have been denied summary judgment. Because Stromberg did "put up" admissible evidence showing Plaintiffs' case to be without merit, it should have been granted summary judgment.

## II.

### THE RATIOS DO NOT APPLY TO CONTRIBUTIONS

Regardless of whether the lower court applied a 1:2 ratio and treated some Classified employees as Journeymen or applied no ratio and treated all Temporary Workers as Journeymen, it was contrary to the CBA to do either. Although Stromberg's contributions were always within the relevant CBA 1:2 or Resolution 78 1:4 ratios, these ratios do not control contribution rates. The plain language of the CBA required the contributions to be made based upon an employee's classification, regardless of whether the employee complement at a site met any ratio.

Plaintiffs admitted the Resolution 78s are controlling and Stromberg agrees as to this point. Therefore, by seeking to apply the CBA ratios, Plaintiffs necessarily would also be bound by the Resolution 78 ratios to control contributions. Stromberg, however, has never agreed that any ratio controls contributions, even though its contributions did in fact meet the 1:2 or 1:4 ratios.

## A.     Plaintiffs Lack Standing to Enforce Such Ratio Clauses

Plaintiffs claim Stromberg's alleged breach of the ratio provision of the CBA is a basis for liability for delinquent contributions to Plaintiffs. (App. 29. Plaintiffs, however, lack constitutional standing under Article III to enforce any such alleged breach of this CBA clause, because Plaintiffs did not suffer any injury due to the alleged violation of the ratio provision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016). Likewise, although the Resolution 78s are controlling documents, their 1:4 ratio is not related to contributions because the CBA makes clear the ratio has nothing to do with contributions. To meet the requirements for Article III standing, Plaintiffs bear the burden of showing: (1) an injury in fact that is "concrete and particularized" and "actual or imminent," (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that the injury is likely to be redressed by a favorable decision. *Id.* Here, Plaintiffs cannot show that they suffered any injury-in-fact, and they have no traceable injury because the ratios do not control contributions.

Plaintiffs have requested relief under ERISA, 29 U.S.C. § 1132(a)(3), as beneficiaries to recover delinquent contributions from Stromberg. Section 1132(a)(3) provides in relevant part that "a civil action may be brought by a . . . beneficiary to (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." In this context, the issue of "standing" is a question of "statutory standing," not Article III standing. *See David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) (plaintiff's status under 29 U.S.C. § 1132(a) is a question of statutory standing, not Article III standing).

Section 1132(a)(3) limits those who can bring an action to "participants," "beneficiaries," and "fiduciaries." 29 U.S.C. § 1132(a)(3). When a union establishes a multi-employer fringe benefit trust fund, and when the union enters into a CBA with an employer that requires contributions to that trust fund, the fund becomes a third-party beneficiary of the CBA and is entitled to rely on its literal terms. *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 139 (4th Cir. 2019).

Plaintiffs lack Article III and statutory standing to pursue delinquent contributions based upon the ratio provisions in the CBA and Resolution 78 Agreements between Local 5 and Stromberg because the CBA and Resolution 78s did not require contributions to Plaintiffs based on the ratios.

Contributions to the Funds are calculated based on the hours worked by specific employees and their actual classifications, not on the basis of an aspirational ratio established for completely unrelated purposes. Since the ratios do not impact

the contribution level to Plaintiffs, their alleged injury is not traceable to any failure to maintain the ratios and they do not have standing to enforce them.

Local 5 and Stromberg entered into a CBA which unambiguously allowed contributions for only employees, based on employee classifications, not ratios. (App. 28, 99, 532). Plaintiffs' Trust documents limit contributions to the terms of the CBA. (App. 193, 194, 203, 224, 2225, 236, 268, 279, 291, 308-09, 335, 352, 370, 379, 395, 407-08, 430, 449-50, 451-53, 453-54). But Plaintiffs cannot point to any language in the CBA or the Resolution 78s that states contributions are in any way affected by the ratios. Plaintiffs therefore cannot show they are entitled to any contributions for alleged ratio violations and lack standing for the alleged delinquent contributions based on alleged ratio violations.

**B.    The plain language of the CBA does not allow reliance upon ratios for contributions**

It is well established that Plaintiffs' only right to contributions is governed by the agreements between Stromberg and Local 5. *Four-C-Aire*, 929 F.3d at 139. Standing requires a traceable injury-in-fact. *Spokeo*, 578 U.S. at 338-39. Here, Plaintiffs cannot make this showing because the CBA ratio (and subsequent Resolution 78 ratios) do not determine the classifications of any employees. Rather, an employee's classification determines contribution rates and there is nothing in the CBA that allows any employee to be deemed some classification he is not. (App. 532).

Ratios are added to the CBA to establish the complement of employees needed between skill levels to achieve "a certain level of productivity on the job." (App. 525). Local 5 admits the ratios serve no other purpose. (*Id*.). These ratios lower the crew cost and allow that employer to competitively bid and obtain work over non-union employer competition. (App. 458). Even if the ratio does not meet the aspirational ratio in the CBA or the Resolution 78s, a non-Journeyman will not be deemed a Journeyman to satisfy a ratio. (App. 532).

Further, Local 5 acknowledges that the ratios are difficult to reach as they are "moving targets." (App. 533). The union also acknowledges that the ratios adopted in the CBA and subsequent Resolution 78s do not always work out due to the number of employees on a job site. (App. 534). For example, if there are only 4 employees, then a 1:2 ratio cannot be met. As stated above, in these situations, employees are not re-classified to meet the ratio numbers or to be less than the 1:2 ratio. (App. 532).

*Ralph's Grocery*, 118 F.3d at 1024, and *W & L Sales,* 728 F. Supp. at 830, show that most provisions of a labor agreement between a union and an employer have nothing to do with contributions to any benefit fund. That is certainly true with this CBA. (*See e.g*., App. 80, Art. VI (shop hours, holidays, energy conservation, etc.), *Id*., Art. VII (transportation to the job), App. 84 Art. IX (who provides tools), App. 93, Add. § 7 (coffee breaks, drinking water, etc.), App. 95, Add. § 25 (political contributions)). There is nothing in the CBA tying employee ratios to contribution

41

rates and Local 5 agrees this is not the purpose of the ratios. Plaintiffs' effort to graft ratios onto contribution rates violates rules of contract interpretation and well established law limiting multi-employer contributions to the union/employer agreement. *Four-C-Aire,* 929 F.3d at 139.

Plaintiffs unquestionably have standing to enforce CBA provisions relating to contributions, but the ratios do not relate to contributions. The ratios relate to the skill of labor Stromberg has to provide quality workmanship, much like the CBA provision related to tools. (App. 84). Just as Plaintiffs have no standing to challenge the tool provision, they have no standing to challenge the ratios. Calculation of contributions consistent with the plain language of the CBA is simple: Determine an employee's classification and multiply that classification's contribution rate by the hours that employee worked. Stromberg does not get a discount on contributions if the workmanship on a job is poor, and it does not get penalized on contributions if the workmanship is good. Ratios are for the sole purpose of skill and productivity (App. 525) and nothing in the plain language of the CBA suggests that ratios affect contributions.

Not only does exclusion of ratios as a factor in contributions follow the plain language of the CBA, but it also has the beneficial result of simplicity. An employee's classification is set and known by Plaintiffs and Local 5 completely independent of contributions. If someone is a Journeyman, they are a Journeyman,

and if they are not, then they are not. The CBA simply sets contribution rates on a clear, unequivocal test of what rate applies to which employees, without having to go through the legal and mathematical gymnastics of trying to deem employees to be Journeymen when they are not Journeymen.

Plaintiffs' solution of "deeming" employees Journeymen for the sole purpose of satisfying the ratios is unworkable. Although the concept of a ratio is theoretically capable of mathematical accuracy, a precise application of any ratio in this setting is not practical without detailed directions from the CBA, directions that do not exist. For example, if Stromberg had 10 employees on a job, with three of them Journeyman and seven not Journeyman, a precise application of the 1:2 ratio would mean that one employee would be "deemed" to be 1/3 of a Journeyman.

Moreover, differing methods of calculation can result in widely varying ratios. In the 3:7 scenario above, for example, if the three Journeymen work 120 hours and the seven non-Journeymen work 240 hours, the result is a 1:2 ratio in hours worked—and it is undisputed that contributions are based on hours worked. Or, suppose a job site with one Journeyman who works 50 hours and two Apprentices who work 150 hours. The ratio of employees would be 1:2, but the ratio of hours would be 1:3. Plaintiffs have offered no explanation as to which method should be used, and the CBA does not address this issue. That is because the CBA avoids the needless complexity and ambiguity Plaintiffs seek to impose upon the CBA's plain

43

language of simply applying an hourly contribution rate to a person's specific classification without reference to ratios.

The Local 5 representative testified, without contradiction, that the union does not expect the ratios to be applied with rigidity. (App. 533). This is because such rigidity in the constantly changing workplace would be impossible. If the intent of the CBA was to deal with these issues in a manner advocated by Plaintiffs, the CBA would not have been silent on such issues. Rather the CBA plainly states how contributions are to be calculated: based upon employee classification without interference by or reference to any ratio.

Furthermore, simply following the plain language of the CBA to set contributions based upon classification is logical and equitable. The reason for the higher Journeyman rate is because Journeymen receive higher benefit levels than Classified employees. By seeking to apply ratios, Plaintiffs are seeking to obtain the higher contribution rate but pay out the lower benefit level. The only justification Plaintiffs have offered for their interpretation is that they get more money if their approach is followed. Yet, this is never a valid principle of contract interpretation.

## III.

## THE GRIEVANCE AGREEMENT ALSO MODIFIED THE CBA

In addition to the Resolution 78s being valid modifications to the CBA, the 2018 Grievance Agreement is entitled to even greater validity because it was reached

under the eyes of Plaintiffs' representatives. The Grievance Agreement and the Resolution 78 Agreements are formal written labor agreements, with the Grievance Agreement being made in the presence of a trustee of the Pension Fund, a representative of the Apprenticeship Fund, and counsel for all Plaintiffs. (App. 462, 661, 62).

Don Dette of Plaintiff Apprenticeship Fund and Local 5 admits that grievance settlements can modify the CBA. (App. 624). In addition to the agreement resolving the Local 5/Stromberg 2017 grievances in which Local 5 agreed not to seek any remedy for Stromberg using contract non-employee Temporary Workers, Local 5 filed a grievance on October 22, 2018. (App. 656, 62). This grievance was ultimately settled with a written Grievance Agreement on January 14, 2019. (App. 457, 660, 872-73, 63). It cannot be disputed that a union and employer can contractually agree that certain work can be performed by subcontractors and its' employees (non-Stromberg employees), and that there is no violation of the CBA for doing so. Under the Grievance Agreement, Local 5 agreed Stromberg could use other subcontractors' Temporary Workers on the Mary Ellen Jones and New Bern projects and no contributions were owed on them. (App. 63, 68). Local 5 allowed that work to be subcontracted and performed by non-employees and, therefore, not subject to contributions since the Temporary Workers were non-employees. Since the CBA (and Trust documents) only requires payments for employees – and the Temporary

Workers are non-employees – any contributions to the Funds for the Temporary Workers would be an illegal violation of Section 302 of the LMRA. 29 U.S.C. § 186(c)(5)(B). The district court erroneously ignored this argument and instead for some unsupported reason based its decision on whether the workers were non-union. (App. 97).

This Grievance Agreement resolved the grievance and served as a contract that modified the CBA as to this not being covered work under the CBA. Here, the Grievance Agreement resolved the contribution issue involving the Temporary Workers, and specifically Local 5 agreed not to go back against Stromberg for working dues, lost wages, etc. (App. 458, 63), while further specifying that a certain level of contribution for Classified employees would be required for one of the Plaintiffs (the Apprenticeship Fund) and simultaneously not stating any other of the Plaintiffs were due any back contributions. (App. 465, 458-59). "The proper interpretation of a contract is a question of law." *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 312 (4th Cir. 2020). "If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

In *Trustees of the Construction Industry & Laborers Health & Welfare Trust v. Interstate Hotel Installation*, No. 2:12-cv-00353-MMD-GWF, 2013 U.S. Dist. LEXIS 30230 at *13–14 (D. Nev. Mar. 5, 2013), the court addressed the preclusive effect of a grievance settlement agreement between a union and employer on several funds' claims for delinquent contributions under ERISA. *Interstate Hotel* is the only case Stromberg has found directly on point concerning a grievance agreement, and Stromberg submits its reasoning is sound and should be adopted by this Court.

In *Interstate Hotel*, the union and Interstate reached a grievance settlement where Interstate agreed to pay a certain amount for back wages and benefits for hours worked between 2007 and 2008. *Id.* at *13. The settlement check provided by Interstate stated that it was paid for a settlement to include "wages and benefits." *Id.* The court granted Interstate's partial motion for summary judgment as it related to the Funds' claims for delinquent contributions as Interstate had already settled the claims over both back wages and benefits with the union. *Id.* at *14. The court rejected the argument from the funds that they were not bound by the grievance agreement. *Id.* Since the funds were third-party beneficiaries of the CBA, they could not sue to recover delinquent contributions that had already been settled by the union and Interstate. *Id.*

The instant case is an even more compelling case for holding trust funds bound to a grievance settlement than in *Interstate Hotel*. Here, counsel for all

Plaintiffs was present for the December 2018 negotiation at which the Grievance Agreement was reached, and she was specifically there to represent at least one of the Plaintiffs, the Health Fund. Moreover, Joseph Powell, a trustee for the Plaintiff Pension Fund and Don Dette for the Plaintiff Apprenticeship Fund were also present for the Grievance Agreement. Therefore, Plaintiffs can hardly claim they were not fully aware of the Grievance Agreement. Further, Plaintiffs have admitted that the written Resolution 78s signed by Local 5, and Stromberg are modifications to the CBA that govern fund contributions. Therefore, Plaintiffs cannot credibly argue that another written agreement signed by Stromberg and Local 5 that addressed much of the same issue is not also a modification of the CBA that governs fund contributions.

Based on the plain language of the Grievance Agreement, Stromberg does not owe back contributions to Plaintiffs for its use of Temporary Workers. The Grievance Agreement did not require back contributions to the Plaintiff Funds based on two traditional rules of contract interpretation: "*expressio unius est exclusio alterius*" and "*ejusdem generis*." "*Expressio unius est exclusion alterius*" is a maxim of contract construction that means: "the expression of one thing is the exclusion of another." *Baker v. Martin*, 330 N.C. 331, 337, 410 S.E.2d 887, 890 (1991). This maxim of contract construction is acknowledged under North Carolina law. *Blackburn v. Trs. of Guilford Tech. Cmty. Coll.*, 822 F. Supp. 2d 539, 544 (M.D.N.C. 2011).

*Ejusdem generis* is a shorthand for the notion that a general term should be understood in light of the specific terms surrounding it. *Pitt Cnty. v. Hotels.Com, L.P.*, 553 F.3d 308, 314 (4th Cir. 2009). Stated another way, *ejusdem generis* provides that "where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including only things of the same kind, character and nature as those specifically enumerated." *Id*

In this case, the maxims of *expressio unius est exclusio alterius* and *ejusdem generis* are applicable to the Grievance Agreement for several reasons. First, the only part of the Grievance Agreement explicitly addressing past contributions to any trust funds is found in Paragraph 5 of the Grievance Agreement. (App. 465). Paragraph 5 acknowledges back contributions may be owed to the local training fund for Classified employees at all job sites for hours worked after May 1, 2016. (*Id.*). Since the Agreement did not address any back contributions to any of the Plaintiff Trust Funds, the Grievance Agreement should not be read to require back contributions to the Plaintiff Trust Funds based on the maxim of *expressio unius est exclusio alterius*.

Second, Paragraph 14 of the Grievance Agreement confirms that Local 5 agreed to withdraw the grievance against Stromberg related to the Temporary Workers and agreed "not to go back against Stromberg for working dues, lost wages

etc." (App. 472). In this case, "etc" is a general, otherwise ambiguous, word following the specific words "working dues" and "lost wages." Since "contributions" are similar to "working dues" and "lost wages," under *ejusdem generis*, Paragraph 14 of the Grievance Agreement should be read to confirm that Local 5 agreed that Stromberg did not owe any back contributions to Plaintiffs.

Moreover, in the underlying grievance the union had requested that Stromberg "makes Local 5 whole for all lost wages, benefits, assessments, and damages caused by the violation of the SFUA." (App. 870). It is clear that the "etc." in paragraph 14 of the Grievance Agreement was meant to encompass all of the requests listed in the October 22, 2018, grievance. Since "benefits" and "damages" would include any Fund contributions, the Grievance Agreement should be read to confirm that Local 5 agreed that Stromberg did not owe any back contributions to Plaintiffs.

## CONCLUSION

This is not a case where Stromberg has failed to account for a single employee in making its contributions. Rather, it is undisputed that Stromberg made all contributions based upon each employee's classification under the CBA. Although the relevant agreements do not establish that ratios affect contributions, because Stromberg complied with its agreements with Local 5 concerning employee ratios, Stromberg's contributions were also consistent with relevant ratios under the CBA and the Resolution 78s. Plaintiffs, however, have sought to manipulate the CBA

50

ratios and ignore the Resolution 78 ratios to have all or some Classified employees deemed Journeymen for purposes of contributions. Plaintiff's effort is contrary to the plain language of the CBA and logic and is further contrary to the Grievance Agreement.

For the foregoing reasons the lower court judgment should be reversed with judgment entered in favor of Stromberg. In the alternative, the lower court's grant of summary judgment for Plaintiffs should be reversed and this case remanded for further proceedings.

### ORAL ARGUMENT REQUESTED

February 15, 2022                           Respectfully Submitted,

                                            KING & BALLOW
                                             */s/Douglas R. Pierce*
                                            Douglas R. Pierce, Esq.
                                            Michael D. Oesterle, Esq.
                                            KING & BALLOW
                                            315 Union Street, Suite 1100
                                            Nashville, Tennessee 37201
                                            (615) 259-3456
                                            dpierce@kingballow.com
                                            moesterle@kingballow.com

                                            Kirsten E. Small, Esq.
                                            NEXSEN PRUET, LLC
                                            104 South Main Street, Suite 900
                                            Greenville, South Carolina  29601
                                            (846) 282-1112
                                            ksmall@nexsenpruet.com

                                            Counsel for ***Appellant Stromberg Metal Works, Inc.***

## CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(g)(8), the undersigned certifies this reply brief complies with the type-volume limitations of FRAP 32(a)(7)(B)(i). As counted by the Microsoft Word 2017-word count tool, this principle brief contains 12,573 words. This brief complies with the typeface requirements in FRAP 32(a)(6) because this reply brief has been prepared in proportionally spaced 14-point Times New Roman font.

Dated: February 15, 2022

*/s/Douglas R. Pierce*_____

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of this Brief was electronically filed and served via the Court's CM/ECF electronic filing system to all counsel of record on this the 15th day of February, 2022.

*/s/Douglas R. Pierce*